IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 10, 2026 Session

**STATE OF TENNESSEE v. JANSEN L. SMITH**

**Appeal from the Circuit Court for Sequatchie County**
**No. 2024-CR-22     Bradley Sherman, Judge**

_____

**No. M2025-00357-CCA-R3-CD**

_____

Following the denial of his motion to suppress, the Defendant was convicted by a Sequatchie County Jury of driving under the influence (DUI), first offense, a Class A misdemeanor.  See Tenn. Code. Ann. § 55-10-401.  He received a sentence of eleven months and twenty-nine days of supervised probation after service of twenty days in jail on weekends.  In this appeal, the Defendant argues the trial court erred in overruling his motion to suppress and admitting evidence obtained from an unlawful detention.  The Defendant contends his arrest was without reasonable suspicion of criminal activity and unsupported by probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Tennessee Constitution.  Because the subsequent detention of the Defendant exceeded the duration of a Terry-type investigatory stop in violation of the Fourth Amendment, we conclude that any evidence seized as a result should have been suppressed as "fruit of the poisonous tree."  Wong Sun v. United States, 371 U.S. 471 (1963).  Accordingly, we reverse the judgment of the trial court, vacate the Defendant's conviction, and dismiss the charge in this case.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed, Vacated, and Case Dismissed.**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and MATTHEW J. WILSON, J., joined.

Theodore A. Engel III, District Public Defender, for the appellant, Jansen L. Smith.

Jonathan Skrmetti, Attorney General and Reporter; Lavy E. Wilber, Senior Assistant Attorney General; Courtney C. Lynch, District Attorney General; and Randy Clark, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On November 27, 2024, the trial court conducted a hearing on the Defendant's motion to suppress. Deputy Joshua Roberts testified that in December 2022 he was employed with the Sequatchie County Sheriff's Office. A hospital volunteer working in the emergency room called Deputy Roberts and advised him that while on a brief break out in his car in the parking lot, he heard "a male screaming and yelling and hitting his vehicle." In response, Deputy Roberts "went ahead and got on [his] radio and hollered for a city unit." Deputy Roberts explained that he did so because, "[i]f a male was being that aggressive[,] I would rather have somebody en route just in case." Deputy Roberts went to the parking lot and interacted with the Defendant "[f]or a brief few moments." Deputy Roberts described the interaction as, "semi okay. [The Defendant] seemed to be extremely nervous and sketchy[.]" Deputy Roberts also described the Defendant as "[r]eady to go." Deputy Roberts said the Defendant left the parking lot; however, Deputy Roberts "had already put out a BOLO [be on the look out] on the vehicle." Deputy Roberts said there was a female in the passenger seat of the Defendant's vehicle, which is why he "continued the BOLO." He said he was concerned about the safety of the female passenger based on the Defendant's actions. Deputy Roberts provided this information to Officer Jacob Kilgore upon his arrival at the hospital parking lot.

On cross-examination, Deputy Roberts confirmed that he was working in central security at the emergency room when he encountered the Defendant. He also confirmed that the hospital volunteer who reported the situation to him was watching it from his car as it unfolded. Deputy Roberts did not personally observe the reported conduct. The Defendant was seated in his vehicle when Deputy Roberts walked outside and approached him. During his interaction with the Defendant, the Defendant talked to Deputy Roberts, was not aggressive, and appeared nervous. Deputy Roberts understood the Defendant had been in "some sort of disagreement[.]" Deputy Roberts said the female in the vehicle did not ask for help, but he explained that it was "two o'clock in the morning and she could have been afraid." Deputy Roberts agreed that there were streetlights in the parking lot of the hospital and that he was wearing a uniform with a badge, a full duty belt, and a gun. He agreed that the female did not express to him in any way that she was afraid, and she did not ask him for help. He emphasized that he continued the BOLO out of concern for the safety of the female passenger. After his brief interaction with the Defendant, the Defendant drove away from the parking lot. At no point did Deputy Roberts tell the Defendant that he had to stay in the parking lot or that he was not free to leave.

On redirect examination, Deputy Roberts said his conversation with the Defendant lasted between one to three minutes. During that time, Deputy Roberts did not have an opportunity to speak with the female passenger. Upon further questioning from the trial court, Deputy Roberts affirmed that the hospital volunteer reported to him that the Defendant was "beating on his own car, hooting, [and] hollering[.]" Upon interacting with

- 2 -

the Defendant, "the Defendant was respectful and when [Deputy Roberts] asked [the Defendant] what was going on [the Defendant] told [Deputy Roberts] nothing and then [the Defendant] pretty much drove off after that." Asked if he noticed any signs of impairment at that time, Deputy Roberts said, "No, sir." Asked again about the female in the vehicle with the Defendant, Deputy Roberts said that he did not see the female in the vehicle because it was too dark, that she did not ask for help or call out to him, and that he did not see any indicator that she herself was in distress. On recross-examination, Deputy Roberts confirmed that the window was rolled down when he interacted with the Defendant and that if the female had spoken to him, he would have heard it. Deputy Roberts also confirmed that there was no report that the Defendant was hitting the female passenger, and he did not observe any injury to the female passenger. On redirect examination, Deputy Roberts said that the hospital volunteer reported that the Defendant was punching at his vehicle and slamming the door. The Defendant was already in his vehicle when Deputy Roberts approached him. Deputy Roberts agreed that in his one-to-three-minute interaction with the Defendant, he did not have enough time to investigate the information he received from the volunteer report. On recross-examination, Deputy Roberts confirmed there was no report that the Defendant was hitting the female in his vehicle and that Deputy Roberts did not observe any injury to the female in the vehicle.

Jacob Kilgore of the Dunlap Police Department testified that sometime between one and two o'clock in the morning on December 3, 2022, he responded to Deputy Roberts' call at the emergency room. He said Deputy Roberts advised him of a disturbance and provided him with a description of the Defendant's vehicle. Asked the nature of the disturbance, Officer Kilgore said, "[t]here was some kind of possible domestic in the parking lot of the individual hitting his car and screaming and shouting." Officer Kilgore said he issued a BOLO for the vehicle, and Detective Layne stopped the vehicle "a short time later." Officer Kilgore arrived at the traffic stop "a short period later" and took over the investigation.

Officer Kilgore approached the Defendant's vehicle and spoke with him. He said the Defendant appeared "calm and kind of lethargic. He wasn't too hyped up or anything." He eventually asked the Defendant to exit the vehicle. Asked whether he asked the Defendant where he came from or anything of that nature, Officer Kilgore said, "I asked him what happened at the [emergency room] and he said nothing." Officer Kilgore continued to ask the Defendant questions about the emergency room; however, he was unable "to get a clear answer so [he] quit that investigation and started the DUI investigation." Asked what led him to believe the Defendant could be under the influence, Officer Kilgore said, "[w]hen I arrived at the [emergency room] they said he may have been under the influence." Asked what "clues" he had upon contact with the Defendant at the vehicle, Officer Kilgore said, "lethargic and just odd behavior[.]"

Officer Kilgore said the Defendant told him that he had taken pain medication. Officer Kilgore conducted an HGN test, and his notes reflected the Defendant's pupil size, equal tracking, lack of smooth pursuit, distinct and sustained nystagmus were at maximum deviation with an onset of nystagmus prior to 45 degrees. In other words, Officer Kilgore said the Defendant had involuntary jerking of the eye and dilated pupils, both of which were indicators that someone could be under the influence. His notes were exhibited to the hearing. Officer Kilgore did not conduct any other field sobriety tests because the Defendant was physically unable to due to medical issues.

On cross-examination, Officer Kilgore provided his background, training, and experience with DUI investigations. He estimated that he had six or seven DUI arrests with a typical year. He confirmed that he responded to the emergency room and that all of the information he received pertaining to that encounter came from Deputy Roberts. He confirmed that Detective Layne never got out of the car, that Detective Layne detained the Defendant until Officer Kilgore arrived, and that the traffic stop conducted by Detective Layne was already in progress when he arrived. Officer Kilgore spoke with the Defendant for approximately a minute or two before he transitioned into the DUI investigation. He agreed that this was "right off the bat." He clarified that the Defendant told him that he had taken pain medication at the hospital. He confirmed that he did not observe the Defendant driving. He agreed that he had no reason to suspect alcohol impairment and his only concern was the medication.

At the conclusion of the proof, the trial court expressed concern with why Deputy Roberts allowed the Defendant to leave the parking lot. The court asked Officer Kilgore if he knew when the BOLO was made, and Officer Kilgore said, "I believe [the Defendant] left and then he gave the BOLO if I remember right." Asked upon further redirect examination by the State how long the entire event was, including the BOLO, speaking with Deputy Roberts at the emergency room, and the stop, Officer Kilgore said, "two to three minutes possibly." Officer Kilgore agreed that the events occurred "almost simultaneous[ly]." On recross-examination, Officer Kilgore confirmed that he spent two minutes with the deputy at the hospital.

In denying the motion to suppress, the trial court made the following findings of fact:

The Court heard testimony from Deputy Joshua Roberts at the Sequatchie County Sheriff's Office and Patrolman Officer Jacob Kilgore from the Dunlap Police Department here. Officer Roberts testified explaining that he was on duty on the day in question, December the 3rd, the evening in question rather, early morning in question, December the 3rd, 2022. He was providing security for the emergency room at the hospital in

- 4 -

his capacity as a deputy with the Sequatchie County Sheriff's Department. There was uncontroverted testimony. There was no hearsay objection or anything like that to the initial sort of foundational and setup remarks regarding what Deputy Roberts heard from this young man that was working there at the [emergency room], evidently, and I, of course, make a finding of fact that some individual was working in the emergency room, working there at the hospital as a volunteer in the specific effort to get hours or some sort of educational credit for the purpose of becoming a paramedic, ambulance driver, something along those lines. That was essentially what Deputy Roberts testified to, that that individual had taken a break and outside apparently noticed the [Defendant], having what I think would be most sensibly characterized as some sort of a fit and taking it out on his own vehicle in the parking lot.

So he immediately let the deputy know what was going on. That all makes sense so far, because the deputy is there specifically to provide security. The deputy took that information that there was folks in the parking lot and that there's a gentleman outside the car beating on his own car and kind of hooting and hollering and having a fit, or acting erratically. Then called for backup, because as Patrolman Kilgore said, he's not -- the deputy is not POST certified and wasn't necessarily fully prepared to deal with all of those -- with the interaction that might ensue when he approached [the Defendant], so he did what a sensible officer would do, he called for backup, and evidently, based upon the timeline that's been established here this afternoon, backup was on [its] way, they responded very quickly. In the meantime, Deputy Roberts goes out and talks to [the Defendant]. It's concerning for the Court that [the Defendant] didn't apparently, you know, give the deputy any pause or any reason to further detain him, ask him to step out of the vehicle, question him about the potential disorderly conduct that he may have been engaging in and that the deputy learned about from the volunteer. Didn't ask, you know, didn't really get into the issue of what was going on with the female passenger and whether there was a domestic altercation.

Now, all these things, apparently, were relayed to, you know, dispatch and the city officer responds. So we've got Deputy Roberts responding to some statements made by a volunteer who happened to witness [the Defendant's] behavior, and he did what he was suppose to do, he went out there and checked it out, and in doing so contacted back, contacted dispatch, called for backup, all the sorts of things that law enforcement officers do. Everything is above board. Everything is good at this point.

- 5 -

Now, it helps the Court to understand fully the timeline involved, because if Deputy Roberts chose not to further detain or question at length [the Defendant], and then [the Defendant] was pulled over sometime and some ways down the road, I'm talking 10, 15, 20, 30 minutes, 5, 10, 15 miles down the road, I would probably agree with [defense counsel's] reasonable suspicion argument that the reasonable suspicion probably should have ended there the moment that the deputy released this gentleman, but knowing that all this matters unfolded in the course of a few minutes in close proximity to each other, I agree with the State's position with regard to the community caretaking function. I mean, they've got reason to think that something is happening to or between these folks. The call had already went out. There's nothing inappropriate or unconstitutional about calling for backup. The BOLO was sort of in place.

Patrolman Kilgore pulls up there to the hospital, speaks very briefly with Deputy Roberts, who I'm taking from his testimony, can't leave the hospital and just go on some sort of chase of his own. [The Defendant] is acting in a way that doesn't comport with what Deputy Roberts just heard from the witness and that probably raised some reasonable suspicion that maybe he was trying to hide something or cover up something there or at least get the police to just leave him alone, disengage so he could go on about his night. I can't find that Patrolman Kilgore did anything wrong in responding to the call and immediately noticing the vehicle just a few moments after Deputy Roberts had interacted with [the Defendant], and apparently when talking to [the Defendant], [the Defendant] had some medical issues that made him unable to conduct most of the field sobriety tests, that gets into the HGN issue. That is technical and that is complicated, but it's also uncontroverted that [the Defendant] at least admitted to using some sort of pain medication here. So in terms of these bare issues of reasonable suspicion to look into [the Defendant] and then probable cause to arrest him, I'm going to come down on the side of the State here and respectfully deny the motion to suppress the evidence[.]

. . . .

It's an interesting case and it might be one that [defense counsel] ends up pursuing all the way if [the Defendant] is convicted, but it seems to me like considering the relative proximity to one another, that all these events took place both temporarily and spatially, I don't think I'm stepping on [the Defendant's] constitutional rights in denying the motion. Seems like the law

- 6 -

was doing their job the whole way. I would think differently and feel different about it if [the Defendant] left the parking lot, Deputy Roberts didn't stop him, didn't think anything was wrong, didn't bother to detain him, or investigate further and then he was pulled over 20 minutes down the road and there was no evidence of him driving badly or like I say, swerving, running a stop sign, anything like that, but because of the way in which all of these events took place so close together both in time and like I say, geographically, I think that there was reasonable suspicion and then probable cause to go ahead and affect the arrest of [the Defendant], so the motion is denied.

Asked to clarify the basis for its ruling, the trial court stated there was reasonable suspicion to support the traffic stop and that the traffic stop was also justified by the community caretaking doctrine.[1] At the close of the motion to suppress, the parties noted their agreement that the HGN would not be used at trial.

The Defendant had a one-day jury trial on December 5, 2024, during which Deputy Roberts testified, in large part, consistently with his motion to suppress testimony. Significantly, however, Deputy Roberts stated that the hospital volunteer reported to him that the Defendant "was yelling or *screaming at a female* that was with him and hitting his own vehicle." Deputy Roberts immediately went to the parking lot, observed the Defendant in his vehicle, and simultaneously issued a BOLO and requested backup from a city officer. Deputy Roberts approached the Defendant as the Defendant was leaving the parking lot. He testified that he got the Defendant to stop his vehicle, and the Defendant rolled down his window. Deputy Roberts asked the Defendant "if what the volunteer said was true[?]" The Defendant replied, "[N]o, nothing happened." Asked what Deputy Roberts did next, Deputy Roberts said, "I was kind of left in my worries trying to think of what to do next." Deputy Roberts then agreed that the Defendant "ended up leaving afterwards." Deputy Roberts said his encounter with the Defendant lasted "[m]aybe 30 to 45 seconds." Deputy Roberts advised Officer Kilgore of this information, another BOLO was placed, and Detective Lane subsequently stopped the Defendant's vehicle.

On cross-examination, Deputy Roberts confirmed that he did not personally observe any of the behavior as reported by the volunteer in the parking lot. He agreed that at the time he yelled for the Defendant to stop his vehicle, the Defendant's window was partially

---

[1] The record on appeal does not include the entry of an order from the trial court denying the motion to suppress; however, neither party contests the ruling of the trial court or whether this issue has been properly preserved for meaningful appellate review. See e.g., State v. Summers, No. W2024-00830-CCA-R3-CD, 2025 WL 832117, at *14 (Tenn. Crim. App. Mar. 17, 2025), perm. appeal denied (Aug. 8, 2025); State v. Davis, No. W2008-00226-CCA-R3-CD, 2009 WL 160927, at *3 (Tenn. Crim. App. Jan. 23, 2009).

down. He agreed that when the Defendant stopped his vehicle, the Defendant rolled his window completely down and spoke with the deputy. At this point, the Defendant appeared calm and "seemed like he was in a little bit of pain[.]" He agreed the Defendant was not yelling and screaming. He agreed that he let the Defendant leave the parking lot.

Detective David Layne with the Sequatchie County Sheriff's Office, a patrolman at the time of the offense, testified that on December 3, 2022, he responded to a BOLO and initiated a traffic stop of the Defendant's vehicle. He obtained the identification from the driver and the passenger, ran their information, and waited for Officer Kilgore to arrive. He said Officer Kilgore arrived "a very short time" after the initial stop. On cross-examination, Detective Layne confirmed that the traffic stop was initiated based solely on the BOLO.

Officer Jacob Kilgore of the Dunlap Police Department testified consistently with his testimony from the motion to suppress. He was dispatched to the emergency room in Sequatchie County and spoke with Deputy Roberts, who advised him of "some kind of disturbance at the [emergency room], a possible domestic." Deputy Roberts also advised him there was a female passenger in the vehicle. He said Deputy Roberts was led to believe that it was a possible domestic based on the "erratic" behavior of the driver in hitting the vehicle. Based on Deputy Roberts report, Officer Kilgore also became suspicious and was concerned for the female passenger in the vehicle. He could not recall whether a BOLO had been issued at the time he arrived at the hospital. He put out a BOLO for the vehicle, and another officer subsequently located and stopped the vehicle. Based on Officer Kilgore's timeline of events, he responded to the hospital a minute after the call from dispatch and spoke with Deputy Roberts at the hospital for "probably a minute."

Upon his arrival at the traffic stop, Officer Kilgore gathered the identification of the Defendant and the passenger and then spoke with the driver about the reported disturbance at the hospital. The Defendant told Officer Kilgore that nothing happened at the hospital. As he did so, Officer Kilgore observed the Defendant to be lethargic in his actions and speech. Officer Kilgore asked the Defendant if he had taken anything, and the Defendant told him he had taken some medicine for pain in the emergency room. Officer Kilgore then asked the Defendant to exit the vehicle to perform field sobriety tests. Officer Kilgore was concerned the Defendant was unable to safely operate the vehicle. Officer Kilgore did not conduct any field sobriety tests due to the Defendant's medical issues. He confirmed that the Defendant told him that he was dying of cancer. He took the Defendant into custody and arrested him for DUI. The Defendant was asked to submit to chemical analysis of his blood and read his implied consent form, which he signed at the jail. Officer Kilgore obtained a blood sample from the Defendant and later examination by the Tennessee Bureau of Investigation revealed that the Defendant's blood contained 11 nanograms per milliliter of hydrocodone (opioid), 0.19 micrograms per milliliter of methamphetamine

(central nervous system stimulant), and 0.06 micrograms per milliliter of cyclobenzaprine (prescribed as a muscle relaxant).

On cross-examination, Officer Kilgore agreed that he did not observe the Defendant driving his vehicle. Based on the implied consent form, the Defendant was arrested by 1:50 that morning. Officer Kilgore agreed that the entire encounter, from responding to the dispatch call to taking the Defendant to the jail, occurred over the course of twenty-eight minutes. Based on this evidence, the jury convicted the Defendant as charged. The trial court subsequently ordered the Defendant to be placed on supervised probation for eleven months and twenty-nine days after service of twenty days in jail on the weekends.

The Defendant filed a motion for new trial relying, in part, on the arguments previously made at the motion to suppress hearing. In denying the motion for new trial, the trial court stated, in relevant part,

> Rather than try to recall of the top of my head the testimony of Deputy Roberts and Officer Kilgore, when they originally gave it in the suppression hearing which was held by agreement up the road in Bledsoe County to accommodate everyone's schedules, I think I'm just going to stand on that transcript. There's a full transcript of that hearing, all the arguments that were made, or there can be a full transcript of that hearing, all the arguments, the testimony of the witnesses, and the Court's ultimate ruling and findings.
>
> The way that this unfolded, as I recall, and I hesitate to do too much of this, because we have already kind of heard it afresh once from the actual law enforcement individuals involved, but the way this unfolded is, essentially, some candy striper told Deputy Roberts, who happened to be working security at the [emergency room] at the hospital, that there appeared to be some sort of altercation or erratic behavior in the parking lot that involved [the Defendant] kind of hitting and kicking his own vehicle and raising his voice. I don't want to speculate on what Deputy Roberts was thinking here today on March the 6th, because I believe he testified to that at length already, but essentially there was some concern that there might have been a domestic situation unfolding in the vehicle. Now if not in the vehicle, in the parking lot by the vehicle, so the deputy goes out there and has an interaction with [the Defendant]. But as I recall the testimony and the record may prove me wrong here, but as I recall the totality of the testimony, he had called for back up because he was not able in that particular post, that particular assignment of guarding the [emergency room] in the hospital providing security, he wasn't able to leave the premises.

So when [the Defendant] drove off, the backup for which Deputy Roberts had called already, standard operating procedure in a domestic, because of the inherit danger of domestic assault situations, I think something like 80 percent of all injuries to law enforcement officers happen in the context of domestic assault calls and don't quote me on that, that's not a stand alone basis for my rulings in this case, but I've heard that anecdotally at least, he had already made the call to get someone else on the scene, because it was a possible domestic and because he couldn't leave, and that officer, Officer Kilgore was already en route when [the Defendant] was allowed to leave, and I remember at the time we discussed, maybe I discussed mostly, my understanding of the time frame and the timeline along which all these event unfolded, and I understood everything to have happened in pretty rapid succession, because I remember specifically thinking and I believe articulating on the record that if the proof were such that there was large sort of gaps of time in the course of this early morning interactions with law enforcement, that I may have ruled differently, but because of the proximity of one aspect of these events to the other, how it all unfolded pretty quickly there, like I understood Deputy Roberts to be saying like as he's heading in and [the Defendant] is pulling off one corner of the parking lot, Officer Kilgore is pulling in the other. Like which way did he go sort of thing. So I say all of that to say that as well drawn as [defense counsel's] motion is and they always are, I'm going to deny it with regard to the paragraphs and arguments (1), (2) and (3) -- or (1) and (2) in particular, because I've already made those rulings.

The Defendant filed a timely notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

The Defendant contends (1) that the traffic stop by Detective Layne was unsupported by reasonable suspicion of criminal activity; (2) that the seizure by Detective Layne was not a valid community caretaking function; and (3) that the subsequent arrest was not supported by probable cause. In response, the State contends the traffic stop was supported by reasonable suspicion based on the following: (1) the trial court accredited Deputy Roberts' testimony that the Defendant was beating on his own vehicle and shouting; (2) Deputy Roberts' trial testimony that the hospital volunteer reported the Defendant was screaming at his female passenger; and (3) Deputy Roberts' trial testimony that the Defendant was extremely nervous and sketchy and Deputy Roberts was worried about the female passenger. The State asserts that it was reasonable for Deputy Roberts to believe that a domestic assault was ongoing and that Deputy Roberts "did not have time"

to ask the Defendant follow-up questions before the Defendant drove away from the hospital. The State also counters that the stop was reasonable pursuant to the community caretaking doctrine because it was reasonable to believe that "something [was] happening to or between these folks" in the vehicle. Finally, the State asserts Officer Kilgore had probable cause to arrest the Defendant for DUI because he appeared "lethargic" and "odd"; he had been beating on his vehicle minutes earlier; and he admitted taking pain mediation at the emergency room.

On appeal from the denial of a motion to suppress, we uphold the trial court's findings of fact "unless the evidence preponderates otherwise." State v. Washington, No. W2022-01201-SC-R11-CD, 2025 WL 2847585, at *3 (Tenn. Oct. 8, 2025) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The credibility of witnesses, the weight and value of evidence, and the resolution of conflicting evidence "are matters entrusted to the trial judge as the trier of fact." Id. Appellate courts may consider evidence offered at both the suppression hearing and trial when reviewing the trial court's ruling on a motion to suppress. Id. (citing State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Because the State prevailed in the trial court, it is entitled to the "strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. (citing Odom, 928 S.W.2d at 23). The trial court's application of the law to the facts, on the other hand, is reviewed de novo with no presumption of correctness. Id. (citing State v. Tuttle, 515 S.W.3d 282, 299 (Tenn. 2017) and State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings.

The Fourth Amendment to the United States Constitution prohibits the government from conducting "unreasonable searches and seizures." U.S. Const. amend. IV. Article I, § 7 of the Tennessee Constitution similarly prohibits unreasonable searches and seizures and is identical in intent and purpose with the Fourth Amendment. State v. Troxell, 78 S.W.3d 866, 870 (Tenn. 2002) (internal citation omitted). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251, 11 S. Ct. 1000, 1001 (1891). The requirement for reasonableness protects individuals from "arbitrary invasions" of their privacy and security by government actors. State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997) (quoting Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S. Ct. 1391 (1979)). "[T]he general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010). The burden is on the State to demonstrate that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); Yeargan, 958 S.W.2d at 629. Terry created a limited exception to the general rule,

and certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime. Terry v. Ohio, 392 U.S. 1, 31, 32-33, 88 S.Ct. 1868, 1885-1886 (1968); Florida v. Royer, 460 U.S. 491, 498, 103 S. Ct. 1319, 1324 (1983).

The stop of a vehicle and the detention of individuals during the stop amounts to a seizure for purposes of both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution and is thus subject to the reasonableness requirement. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Brotherton, 323 S.W.3d 866, 870 (Tenn. 2010). "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one -- (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place." See State v. Montgomery, 462 S.W.3d 482, 487 (Tenn. 2015) (citing Terry, 392 U.S. at 20, 88 S.Ct. at 1879); see also United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S. Ct. 2574, 2580 (1975) (noting that a police officer who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion").

There are three categories of police intervention with private citizens: (1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrong-doing; and (3) a brief police-citizen encounter, requiring no objective justification. State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not. State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006). Neither party in this case argues that the first encounter between the Defendant and Deputy Roberts was a full-scale arrest, a brief police-citizen encounter, or consensual. Accordingly, we must first determine whether Deputy Roberts had reasonable suspicion to believe that the Defendant had committed or was about to commit a crime to justify stopping the Defendant in the emergency room parking lot.

An officer conducting an investigatory stop based on reasonable suspicion of criminal wrongdoing "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Nicholson, 188 S.W.3d at 659 (citing Terry, 392 U.S. at 21, 88 S.Ct. at 1880). "Reasonable suspicion" for a detention is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218 (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)). Whether reasonable suspicion for an investigatory stop exists must be evaluated under the totality of the circumstances known to the police at the time of the stop. Id. (citing Binette, 33 S.W.3d at 218). A mere "inchoate and unparticularized

suspicion or 'hunch'" is not enough to generate reasonable suspicion. <u>Terry</u>, 392 U.S. at 27, 88 S.Ct. at 1883. Reasonable suspicion is an objective standard evaluated in light of the totality of the circumstances surrounding the seizure, which may include an officer's observations, information from other law-enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, deductions based upon experience, and the nature of the suspected crime. <u>Montgomery</u>, 462 S.W.3d at 487 (citing <u>State v. Williamson</u>, 368 S.W.3d 468, 474-75 (Tenn. 2012)).

In assessing the reasonableness of the duration and scope of a detention, the officer's actions must be reasonably related to the circumstances that justified the interference in the first place, and the detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. <u>State v. Cox</u>, 171 S.W.3d 174, 179-80 (Tenn. 2005) (adopting the rationale in <u>Royer</u> and concluding that the duration of a stop must be "temporary and last no longer than necessary to effectuate the purpose of the stop); <u>Troxell</u>, 78 S.W.3d at 871. "[T]he proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." <u>Troxell</u>, 78 S.W.3d at 871; <u>State v. Simpson</u>, 968 S.W.2d 776, 783 (Tenn. 1998); <u>see also</u> <u>United States v. Sharpe</u>, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Otherwise, a detention that is reasonable at the outset can become unreasonable and constitutionally invalid if the time, manner, or scope of the investigation exceeds the proper parameters. <u>Montgomery</u>, 462 S.W.3d at 487; <u>Troxell</u>, 78 S.W.3d at 871 (quoting <u>United States v. Childs</u>, 256 F.3d 559, 564 (7th Cir. 2001)). Significantly, "[a]n investigatory traffic stop under <u>Terry</u> 'is a far more minimal intrusion [than an arrest pursuant to probable cause], simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.'" <u>Brotherton</u>, 323 S.W.3d at 870 (quoting <u>Illinois v. Wardlow</u>, 528 U.S. 119, 126 (2000)). "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." <u>Royer</u>, 460 U.S. at 500.

**Justification for Stop.** Evaluating the totality of the circumstances of this case in light of the well-settled principles of law set forth above, we conclude that Deputy Roberts' action in stopping the Defendant was justified at its inception. In reaching this conclusion, the first question we ask is whether Deputy Roberts held a belief that the Defendant had committed or was about to commit a crime. If so, the question becomes whether that belief was objectively reasonable under the totality of the circumstances. Here, in denying the motion to suppress, the trial court provided general findings of fact and merged its analysis of what justified the initial stop with its analysis of whether the duration of the stop was reasonable. Nevertheless, a fair reading of the court's reasoning can be understood to have found that Deputy Roberts believed the Defendant had committed or was about to commit the offense of disorderly conduct. The court also noted that the officers had "reason to

- 13 -

think that something is happening to or between these folks," but the court did not state that Deputy Roberts believed that the Defendant was engaged in domestic assault. Even had the court done so, we conclude that any such belief would have been unreasonable under the totality of the circumstances.

To be a valid investigatory stop, Deputy Roberts was required to point to specific and articulable facts that are sufficient to give rise to an inference that the Defendant was engaged in a crime. Before the stop, Deputy Roberts received a report from a volunteer at the hospital that an individual was outside in the parking lot of the emergency room, yelling and hitting his own vehicle. We recognize a marked inconsistency between Deputy Roberts' suppression hearing testimony and at trial, in that his trial testimony included the hospital volunteer reported that the Defendant was yelling *at* a female who was with him. See State v. Greer, 749 S.W.2d 484, 486 (Tenn. Crim. App. 1988) (finding officer's testimony between motion to suppress hearing and trial to be a variance in form rather than material matter and affirming conviction because such variance in officer's testimony would not have changed the ruling of the trial court). Nevertheless, Deputy Roberts simultaneously issued a BOLO and called for assistance from another officer in the event the Defendant became aggressive with him. Based on the report from the hospital volunteer, Deputy Roberts had reasonable and articulable suspicion to believe that the Defendant had been or was about to be involved in criminal conduct. At a minimum, it was objectively reasonable for Deputy Roberts to infer from the volunteer report that the Defendant was engaged in disorderly conduct. See Tenn. Code Ann. § 39-17-305(a)(1) ("[a] person commits [the] offense [of disorderly conduct] who, in a public place and with intent to cause public annoyance or alarm . . . [e]ngages in fighting or in violent or threatening behavior[.]").

The same hospital volunteer report did not establish reasonable and articulable suspicion from which to infer that the Defendant was involved in or about to be involved in domestic assault. See Tenn. Code Ann. § 39-13-101 (a)(1)-(3) ("[a] person commits assault who:(1) [i]ntentionally, knowingly or recklessly causes bodily injury to another; (2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative."); Tenn. Code Ann. § 39-13-111(a)(2), (3), (b) (defining domestic assault as an assault against a "domestic abuse victim," which includes adults "who have lived together" or "who have dated" or "who had a sexual relationship"). We acknowledge Deputy Roberts' vigilance and responsiveness in attempting to recognize signs of potential domestic violence, and his dedication to public safety and the welfare of vulnerable individuals. His approach here, as noted by the trial court at the motion for new trial, reflects a broader commitment to addressing domestic violence, which remains a critical societal issue. However, the hospital volunteer did not report that the Defendant hit the female or that she was in any

danger. Deputy Roberts had no information that the female had been threatened or injured. At most, the Defendant was involved in a verbal dispute, which is not a crime. Accordingly, there were no articulable facts supporting a belief that a crime involving domestic assault was afoot before Deputy Roberts stopped the Defendant. While these facts alone do not provide specific and articulable suspicion of domestic assault, the initial stop of the Defendant was justified at its inception based on Deputy Roberts' objective belief that the Defendant was engaged in the offense of disorderly conduct.

**Scope and Duration of Detention.**    Next, we must assess whether the investigatory detention was reasonable in duration and scope. Because Deputy Roberts permitted the Defendant to leave the parking lot, the Defendant maintains that it was no longer reasonable to suspect that a domestic assault had occurred or was in progress. In support, the Defendant cites the findings of the trial court that "[the Defendant] didn't apparently . . . give the deputy any pause or any reason to further detain him[.]" The Defendant insists that all of the facts known to Deputy Roberts that produced his hunch of domestic disturbance were known to Deputy Roberts the moment he concluded his conversation and watched the Defendant drive away from the hospital. The Defendant argues those facts adduced from the initial stop and detention at the hospital cannot support the second traffic stop "some distance down the road" by Officer Kilgore.

In response, the State argues that Deputy Roberts "did not have time to ask the Defendant follow-up question before the Defendant drove away." The State attaches no legal significance to the fact that the Defendant was stopped twice and contends the circumstances which justified Deputy Roberts' interference, i.e. a report of someone yelling at a female in the parking lot, still existed at the time Officer Kilgore began his investigation during the second stop of the Defendant.

The facts of this case are unique and require this court to evaluate not one, but two stops of the Defendant by law enforcement officers in succession on the same day. Tennessee courts have not had the opportunity to consider the constitutional implications of successive investigatory stops. Accordingly, some discussion of how other jurisdictions have dealt with this issue is helpful to our resolution of this case.

In United States v. Ilazi, 730 F.2d 1120, 1125 (8th Cir. 1984), officers observed two suspicious men while conducting routine surveillance to intercept drug traffickers at a Minneapolis airport. Both of the men were staggering as they walked, the officers noticed the men sniffing and inhaling deeply after placing their fingers near their noses, and one of the men was walking with some difficulty, continually stomping both feet as he went. The officers approached the men near an airport bar, inquired about their travel plans, and then thanked the men for their cooperation and left. Id. at 1121-22. After leaving the bar, the officers explained the situation to two DEA agents who were also on duty at the airport.

- 15 -

The DEA agents watched the two men as they left the bar and, like the officers, they noticed that one of the men walked with a strange gait—like "a two-year-old child with a dirty diaper." Id. at 1123. Based on this observation and their conversation with the officers, the DEA agents approached the men, asked to see their travel papers, and inquired about their trip. During this second round of questioning, the agents noticed a bulge in the right boot of one of the men, and a subsequent search revealed it was heroin. In considering whether the investigatory stops were properly limited in scope and duration, the court observed that to consider the reasonableness of each investigatory stop individually would allow for police-officer "gamesmanship." In other words, officers could conduct successive, limited stops based on the same reasonable suspicion in order to circumvent constitutional limitations on duration.

However, the court rejected the defendant's contention that the second stop, occurring so close in time to the initial stop, exceeded the bounds of an investigatory stop, and therefore constituted an arrest without probable cause. Where there is not one stop, but two, the court observed,

> [B]oth must be limited in scope and duration. To end our inquiry here . . . would allow law enforcement officials to circumvent [constitutional] requirements by subjecting an individual to successive stops, each sufficiently limited in scope and duration to satisfy the conditions of an investigatory seizure, but collectively so intrusive as to be tantamount to an arrest.

Ilazi, 730 F.2d at 1125. While the court acknowledged the coercion inherent in the successive stop situation and that successive stops of an individual based on the same information strongly indicate a finding that an arrest has taken place, see United States v. Morin, 665 F.2d 765, 769 (5th Cir. 1982), this observation does not compel a finding that an arrest occurs in every case involving successive stops. Ilazi, 730 F.2d at 1125. Rather, the presence of successive stops is to be added to the list of factors to be considered in determining when an interrogation rises to the level of arrest. Id. at 1126.

In United States v. Peters, another successive stop case, an officer initially stopped Peters for weaving and noticed that the driver, in responding to the officer's questions, seemed nervous. 10 F.3d 1517, 1522 (10th Cir.1993). The officer requested a drug sniff dog, but no dogs were available. The officer released Peters because he lacked probable cause to detain him. The officer then informed his superior that he "'didn't feel good' about the stop[,]" and his superior relayed the information to a DEA agent, who then referred the information to a border patrol agent. Based on the information received from the other law enforcement officers, the border patrol agent later stopped Peters because he looked nervously at the agent and abruptly changed lanes. Id. at 1519-20. During the

second stop, a counterfeit social security card and other false identification documents were found hidden in a suitcase. On appeal, the Tenth Circuit rejected the defendant's nervous behavior as reasonable and articulable grounds to support the second stop and observed,

[W]hen reasonable suspicion has been dispelled or probable cause has not developed, the conduct upon which the officer originally based his suspicions has proved to be an illusory ground for suspicion under the particular circumstances, and thus, has been exhausted. Being illusory, the ground no longer reasonably supports a continuation of the search. Absent a new and independent basis for suspicion, the officer must halt his investigation in accordance with [Terry, 392 U.S. at 30, 88 S.Ct. at 1884] and [United States v. Place, 462 U.S. 696, 717, 103 S.Ct. 2637, 2649, 77 L.Ed.2d 110 (1983)].

Of course, a second officer who is unaware of the fruitless search conducted earlier may initiate his own investigation based on the same "suspicious" behavior that was exhausted by the first officer's failed investigation. The officer who performed the original investigation, however, may not release the suspect as required by Terry and Place, wait until he has travelled down the road a few miles, and then make a second Terry stop based solely on the conduct that has already proved to be illusory. Similarly, the officer cannot circumvent Terry and Place by calling upon a different officer to make the second intrusion in his stead.

Id. at 1522; see also United States v. Padilla-Esparza, 798 F.3d 993, 1000-1001 (10th Cir. 2015) (distinguishing Peters where agents quickly aborted first stop based on erroneous belief that they had pulled over wrong truck and reasoning that the border agents' initial stop of the defendant did not dispel reasonable suspicion); United States v. Foreste, 780 F.3d 518, 525 (2d Cir. 2015) (concluding that "where the same suspicion justifies successive investigation, and the officer conducting the subsequent investigation is aware of the prior investigation and the suspicion that supported it, the investigations' duration and scope must be both individually and collectively reasonable under the Fourth Amendment").

The above cases are persuasive and convince us that there is no per se rule prohibiting a successive stop of a defendant and that a successive stop of a defendant is but one of the factors on the list of factors to be considered when determining the reasonableness of the scope and duration of an investigatory stop. In addition, the reasonableness of the scope and duration of a successive stop depends, in large part, on whether the investigatory detentions were based on the same or independent reasonable suspicion. Foreste, 780 F.3d at 525.

- 17 -

Evaluating the totality of the circumstances of this case with the above law in mind, we conclude (1) that reasonable suspicion had been dispelled during the first stop when Deputy Roberts released the Defendant from the parking lot; and (2) that the second stop of the Defendant's vehicle involving Officer Kilgore was based entirely on information he received from Deputy Roberts and not independent reasonable suspicion. In analyzing the information gained by Deputy Roberts during the initial stop, the trial court found that the Defendant was "acting in a way that [did not] comport with what Deputy Roberts just heard from the witness and that probably raised some reasonable suspicion that maybe he was trying to hide something or cover up something there or at least get the police to just leave him alone, disengage so he could go on about his night." Nothing in the record supports the court's finding that the Defendant was trying to hide or cover up something, and one cannot infer illegality from the Defendant's desire to leave the parking lot free from government intrusion. Indeed, the court's comment lends credence to the conclusion that the disturbance was no longer ongoing when Deputy Roberts stopped and questioned the Defendant. When Deputy Roberts approached the Defendant, Deputy Roberts was in uniform, carrying a gun, and wearing a utility belt. Deputy Roberts spoke with the Defendant, and the Defendant stopped his vehicle and rolled down the driver's side window. Although it was dark, Deputy Roberts observed a female in the passenger seat of the Defendant's vehicle. Deputy Roberts asked the Defendant what was going on, and the Defendant told him nothing. Although the Defendant was nervous and seemed sketchy, he answered Deputy Roberts' question; he was not aggressive, and he was respectful. Deputy Roberts permitted the Defendant to leave the premises. The entirety of Deputy Roberts' investigatory stop of the Defendant was one to three minutes.

Clearly, the circumstances described by the hospital volunteer report were no longer present when Deputy Roberts approached the Defendant's vehicle. Deputy Roberts described the Defendant as calm and respectful. He was no longer hitting his vehicle or yelling at or in the presence of the female. Deputy Roberts conceded as much by stating at the motion to suppress that the only reason he kept the BOLO in place after talking with the Defendant was his concern for the female's safety. Any reasonable suspicion that the Defendant was committing or about to commit disorderly conduct had been dispelled.

As previously noted, there were no articulable facts supporting a belief that a crime involving domestic assault was afoot before Deputy Roberts stopped the Defendant. In terms of evaluating the reasonableness of the duration of the stop, we observe at the top of the analysis that the record does not contain any evidence demonstrating whether Deputy Roberts had specialized knowledge or training in identifying signs of domestic violence. In continuing the BOLO after his interaction with the Defendant, Deputy Roberts did not identify any articulable facts beyond the presence of the female, the early morning hour, and the Defendant's nervous behavior to support further detention of the Defendant. Deputy Roberts explained that he was unable to finish his investigation because he did not

have enough time and it was dark. However, it was Deputy Roberts who inexplicably chose to release the Defendant prior to the arrival of Officer Kilgore. At trial, Deputy Roberts was asked what he did after the Defendant told him nothing had happened, and Deputy Roberts said, "I was kind of left in my worries trying to think of what to do next." Deputy Roberts then agreed that the Defendant "ended up leaving afterwards." We acknowledge the trial court's comment from the hearings on motion to suppress and motion for new trial that Deputy Rogers could not leave the parking lot. However, the record does not contain any information supporting this finding, and therefore, preponderates against the determination of the trial court. We emphasize that there was nothing in the record to explain why the Defendant was released by Deputy Roberts.

There was also lighting in the hospital parking lot, and Deputy Roberts was dressed in uniform and armed with a gun. Deputy Roberts interacted with the Defendant for approximately one to three minutes. During this time, the female passenger did not ask for help, appear to be afraid, or exhibit any signs of distress. Under these circumstances, Deputy Roberts lacked an objectively reasonable basis to believe that the Defendant was committing or about to commit domestic assault. To hold otherwise, on this record, would prolong the detention in this case based on general assumptions about domestic violence. While we agree with the trial court's concerns regarding domestic violence, the Fourth Amendment strictures demand government intrusions to be based on particularized facts. Because Deputy Roberts did not observe any signs of domestic assault during his interaction with the Defendant, the Defendant was required to be released.

Here, in terms of timeframe, the trial court found only generally that "all th[ese] matters unfolded in the course of a few minutes in close proximity to each other" and occurred in "pretty rapid succession." Based on the record, the Defendant's initial encounter lasted one to three minutes, which, in isolation, was reasonable in scope and duration given the report of disorderly conduct. However, Officer Kilgore responded to the emergency room after the Defendant was released and spoke with Deputy Roberts for approximately two minutes. At some point after their discussion, the Defendant was stopped a second time and detained by Detective Layne based on a BOLO issued by Officer Kilgore. The Defendant had left the hospital parking lot; however, it is unclear how far away from the hospital he was when the second stop occurred. Detective Layne detained the Defendant long enough to obtain identification from the Defendant and the female passenger and to run a check on their information. Officer Kilgore arrived at the second stop "a very short time" later, and he did not observe the Defendant driving. Officer Kilgore began his investigation by asking the Defendant, yet again, what happened at the emergency room, and the Defendant again said nothing. Officer Kilgore repeatedly asked the Defendant questions about the emergency room; and when he did not get a clear answer, Officer Kilgore started the DUI investigation.

The second investigatory stop and detention of the Defendant was therefore based solely on information obtained from the first stop by Deputy Roberts. As such, the second stop was an unreasonable extension of the first stop unless it was supported by independent reasonable suspicion of criminal conduct. There was no evidence introduced by the State, apart from what Officer Kilgore learned from Deputy Roberts, to support reasonable suspicion anew for the second stop of the Defendant. We acknowledge that Officer Kilgore said that he was led to believe, based on information from the emergency room, that the Defendant could be under the influence. However, Deputy Roberts clearly testified that he did not observe any signs of impairment during the first stop. Accordingly, the duration and scope of the detention violated the Fourth Amendment's general proscription against unreasonable searches and seizures, and any evidence seized as a result must be suppressed.

II. We address the remaining issues so as not to pretermit in the event of further appellate review. The State seeks to justify the second warrantless stop of the Defendant under the community caretaking exception. In denying the motion to suppress, the trial court "agree[d] with the State's position with regard to the community caretaking function. I mean, they've got reason to think that something is happening to or between these folks." The record, however, shows that, prior to the second stop, Deputy Roberts had already investigated the situation, found no evidence of criminal activity, observed no signs of distress or danger, and allowed the Defendant to leave the hospital parking lot. The second officer's stop—based solely on Deputy Roberts generalized concern for the female passenger—occurred after the situation had been resolved and without any new facts suggesting a need for assistance or a threat to public safety. Under State v. McCormick, 494 S.W.3d 673 (Tenn. 2016), we conclude the community caretaking exception does not apply.

In holding that the act of community caretaking by law enforcement was also an exception to the Fourth Amendment warrant requirement, the Tennessee Supreme Court sought to strike a proper balance between the public's interest in having police officers assist citizens in need and the individual's interest in being free from unreasonable governmental intrusion. McCormick, 494 S.W.3d at 686. "[W]hen the community caretaking exception is invoked to validate a search or seizure, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse." Id. The community caretaking exception will justify a warrantless seizure so long as the State establishes

> that (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the

intrusion were reasonably restrained and tailored to the community caretaking need.

Id. "Determining whether police action is objectively reasonable in light of the circumstances requires careful consideration of the facts of each case[,]" including "the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk of danger if the officer provides no assistance." Id. (internal citations omitted).

As previously discussed, Deputy Roberts' observations during the first stop eliminated any reasonable basis for community caretaking. Deputy Roberts approached the Defendant in the hospital parking lot, asked what was going on, received the response "nothing," observed a female passenger in the vehicle, saw no injuries, no signs of distress, received no request for help, and ultimately let the Defendant go. These facts affirmatively dispel any notion that the Defendant or the female passenger required assistance. Under McCormick, the community caretaking exception requires specific and articulable facts indicating a need for aid. Here, Deputy Roberts' own observations generated the opposite conclusion: there was no emergency, no medical issue, no threat, and no reason to intervene further. Once he allowed the Defendant to leave, the situation was resolved. Any caretaking concern had dissipated.

Deputy Roberts' statement that he "did not have time" to investigate whether the female passenger was safe did not elevate the encounter to an emergency. To the contrary, his statement confirms that during his encounter with the Defendant, he did not observe any facts suggesting an emergency. Had he seen anything objectively alarming, he would have been obligated to act immediately. His decision to let the Defendant go, combined with his statement that he lacked time to investigate further, demonstrates that he perceived no immediate threat requiring intervention. His statement also shows that any concern he may have held was speculative, not based on specific and articulable facts. Under McCormick, the community caretaking exception cannot rest on a vague sense that "something might be wrong" or that the female passenger "could have been afraid." Deputy Roberts' statement reveals that he did not identify any concrete facts suggesting danger. A hypothetical or uninvestigated concern is not enough to justify a later seizure.

The second stop involving Officer Kilgore stemmed from the first, and therefore, also based on a generalized concern, not specific and articulable facts. Officer Kilgore ordered the second stop of the Defendant based solely on Deputy Roberts generalized concern for the female passenger's safety. But McCormick requires specific, articulable facts, not vague unease or speculative fears. 494 S.W.3d at 686. Officer Kilgore did not observe the initial encounter, did not witness any distress, did not see any injury, did not receive a report of a continuing emergency, and had no independent basis to believe

assistance was needed. A generalized concern is insufficient under McCormick. The exception to the warrant requirement cannot rest on a hunch or intuition. It requires objective facts demonstrating a real need for assistance. Here, there were none.

Finally, under McCormick, courts must consider the risk of danger if the officer provides no assistance. 494 S.W.3d at 688. Here, the risk was low to almost nonexistent. The Defendant was coherent and responsive, the passenger showed no signs of distress, no one requested help, the vehicle was safely operated, and the Defendant had already left the hospital without incident. These facts foreclose any claim that immediate intervention was necessary. Even if the State could satisfy the first prong—which it cannot—the second prong independently fails. The second stop was not "reasonably restrained and tailored" to a caretaking need. Under McCormick, the community caretaking exception cannot justify a seizure that is untethered to an immediate need, duplicative of an already completed inquiry, or based on speculation rather than observable facts. Id. Because the second stop was unsupported by the community caretaking exception, it was unconstitutional, and all evidence obtained as a result must be suppressed.

III. Even if the traffic stop had been lawful, the Defendant argues his arrest was without probable cause. The Defendant insists the facts available to Officer Kilgore to signal intoxication, including, "lethargic" behavior, "odd" demeanor, admitting to taking pain medication, and failure on the HGN test, were insufficient to establish probable cause to arrest him for DUI. In response, the State contends, and we agree, that Officer Kilgore had probable cause to arrest the Defendant based on the same facts.

Another exception to the Fourth Amendment warrant requirement occurs when an arrest is supported by probable cause. State v. Bell, 429 S.W.3d 524, 529 (Tenn. 2014); State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012) (citing State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) and Virginia v. Moore, 553 U.S. 164, 171, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008)). Thus, Tennessee law provides that an officer may make a warrantless arrest for DUI—as "a public offense committed or a breach of the peace threatened in the officer's presence"—so long as probable cause exists. Id. at 530 (internal citations omitted).

The Tennessee Supreme Court has recognized that it is impossible to precisely articulate what probable cause means. State v. Smith, 484 S.W.3d 393, 400 (Tenn. 2016). Instead, probable cause is a "'practical, nontechnical concept[,]'" id. (quoting State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989)), and "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt." Bell, 429 S.W.3d at 530 (citing Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). "'[T]he strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable

doubt.'" State v. Davis, 484 S.W.3d 138, 143-44 (Tenn. 2016) (quoting State v. Bishop, 431 S.W.3d 22, 41 (Tenn. 2014)). "'[T]he constitutional validity of the [seizure] does not depend on whether the suspect actually committed any crime,' and 'it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with or whether a person is later acquitted of the crime for which she or he was arrested.'" Id. at 144 (alteration in original) (quoting Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (citations omitted)). "[P]robable cause exists when 'at the time of the [seizure], the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" State v. Dotson, 450 S.W.3d 1, 50 (Tenn. 2014) (quoting State v. Echols, 382 S.W.3d 266, 277-78 (Tenn. 2012)); see Smith, 484 S.W.3d at 400.

Tennessee Code Annotated section 55-10-401 describes a DUI offense and states that it is unlawful for a person to drive while:

> [u]nder the influence of an intoxicant . . . that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess.

At the time of the Defendant's arrest, Officer Kilgore knew the following facts: the Defendant had been involved in a disturbance at the hospital and hit his vehicle and yelled and screamed in the presence of or at a female, he was lethargic, his actions and speech were slow, and he admitted to having taken pain medication at the hospital. The Defendant also failed the HGN test, which showed five signs of intoxication including involuntary jerking of the eye and dilated pupils. Considering the totality of the circumstances, we conclude that these facts were sufficient to enable a prudent person to believe that the Defendant had committed or was about to commit the offense of DUI. In reaching this result, we are mindful that a suspect need not exhibit every known sign of intoxication in order to support a determination of probable cause, Bell, 429 S.W.3d at 532, and in assessing probable cause, we deal with probabilities, not hard certainties. State v. Reynolds, 504 S.W.3d 283, 301 (Tenn. 2016). Accordingly, Officer Kilgore had probable cause to arrest the Defendant without a warrant for operating a motor vehicle while under the influence of an intoxicant.

## CONCLUSION

Based on the foregoing reasoning and analysis, we conclude that the second stop of the Defendant was an unreasonable extension of the first; and therefore, the duration of the Defendant's detention was unconstitutional. Accordingly, the trial court erred in denying the Defendant's motion to suppress the seizure of the Defendant's blood during the second

- 23 -

stop.  We reverse the order of the trial court, vacate the judgment of conviction, and dismiss the charge against the Defendant.

s/ **_Camille R. McMullen_**

CAMILLE R. MCMULLEN, JUDGE